UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SANDRA HERRERA, *et al.*

                Plaintiffs,

        v.

PIERCE COUNTY, *et al.*

                Defendants.

CASE NO.  C95-5025RJB/JKA

REPORT AND
RECOMMENDATION

NOTED FOR: October 28, 2010

      This 42 U.S.C. 1983 class action filed January 19, 1995, has been referred to the undersigned Magistrate Judge.  Before the court is defendants' motion to terminate the consent decree in this case (Dkt. # 316).  The court has considered all materials submitted in support of and in response to this motion.  Additionally, the court heard oral argument on the motion October 12, 2010.  The court appointed monitor, Judith Cox, participated telephonically.  For the reasons set forth below, the undersigned recommends the motion be GRANTED IN PART AND DENIED IN PART.  Issues relating to alcohol withdrawal monitoring, assessment at intake, and chronic disease

REPORT AND RECOMMENDATION 1

care survive this motion and should be set for trial or an evidentiary hearing.  In all other respects the consent decree should be terminated.

## R E P O R T

This action addresses the conditions of confinement at the Pierce County Jail. A consent decree was entered March 28, 1996 (Dkt.#89).   Over the years the parties have agreed to dissolve portions of the original consent decree by stipulation.   On December 9, 2009, again by stipulation, the parties entered into a new settlement agreement.

### Automatic stay under 18 U.S.C. 3626

As an initial matter, the court addresses the automatic stay provision of 18 U.S.C. 3626(e). This provision stays injunctive relief 30 days after a motion to terminate the relief has been filed. Defendants argue the consent decree dissolves 30 days after filing of the motion to dismiss.  The court agrees because, as discussed below, the motion is brought pursuant to 18 U.S.C. 3626 (b) (2). At oral argument plaintiffs requested a 60 day extension of the stay.  Defendants did not object to an extension.

a.      History of judicial action.

The parties entered into a consent decree in March of 1996 (Dkt. # 89).  Thereafter, the parties continued to operate under the framework provided by this consent decree.  In March of 1998, the court approved a new stipulated plan (Dkt. # 104).  By agreement of the parties the plan was again modified in October of 2001 (Dkt. # 117).

On September 10, 2009, the defendants moved to terminate all provisions of the consent decree other than those relating to health care (Dkt. # 251).  On October 23, 2009, the court entered an order terminating all provisions of the consent decree as to all issues other than health care and required the parties mediate the remaining issues (Dkt. # 274).

REPORT AND RECOMMENDATION 2

The parties, again by stipulation, entered into a new settlement agreement which was approved by this court on December 9, 2009 (Dkt. # 284).  That agreement listed ten issues to be considered by the court appointed monitor.  The areas of concern noted were:

1.    Segregation rounds.

2.    Response to medical kites.

3.    Response to mental health kites.

4.    Refusal of care (written).

5.    Training of custody staff performing reception screening.

6.    Privacy at Intake.

7.    Management of alcohol withdrawal.

8.    Chronic disease program.

9.    Continued quality improvement program.

10.    Mental referrals from booking.

(Dkt. # 284, Exhibit A).

    b.    <u>Discussion of the stay provision</u>.

The motion to terminate is made pursuant to 18 U.S.C. 3626 (b). The statute provides:

(b) Termination of relief.--

(1) Termination of prospective relief.--(A) In any civil action with respect to prison conditions in which prospective relief is ordered, such relief shall be terminable upon the motion of any party or intervener--

    (i)    2 years after the date the court granted or approved the prospective relief;

    (ii)    1 year after the date the court has entered an order denying termination of prospective relief under this paragraph; or

    (iii)    in the case of an order issued on or before the date of enactment of the Prison Litigation Reform Act, 2 years after such date of enactment.

REPORT AND RECOMMENDATION 3

(B)     Nothing in this section shall prevent the parties from agreeing to terminate or modify relief before the relief is terminated under subparagraph (A).

(2)     Immediate termination of prospective relief.--In any civil action with respect to prison conditions, a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

(3)     Limitation.--Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

(4)     Termination or modification of relief.--Nothing in this section shall prevent any party or intervener from seeking modification or termination before the relief is terminable under paragraph (1) or (2), to the extent that modification or termination would otherwise be legally permissible.

18 U.S.C. 3626 (b) (emphasis added).

It has not been two years since the court approved the prospective relief outlined in (Dkt. # 284). Therefore, section (b)(1)(i) does not apply. It has not been one year since the court denied a motion to terminate the decree, as no motion to terminate relief has ever been denied. Further, the date of enactment of the Prison Litigation Reform Act is irrelevant as the court order at issue was entered December 9, 2009, long after the 1996 enactment date of the Prison Litigation Reform Act. Therefore the motion to terminate must be brought under section (b)(2).

The motion to terminate the remaining health care provisions was filed September 2, 2010. In accordance with the court's Local Rules, defendants noted the motion for hearing September 24, 2010. Oral argument was requested and set for October 12, 2010. Thus, this matter was not ripe for consideration until October 12, 2010.

REPORT AND RECOMMENDATION 4

Given that this matter was not ripe for consideration until October 12, an extension of the postponement of the stay provision until 90 days from September 2, 2010 is certainly warranted. The undersigned recommends that the consent decree remain in effect until December 1, 2010.

Burden of Proof

As a second preliminary matter, defendants argue the burden of proof is on the plaintiffs to show an ongoing violation of a constitutional right in order to extend injunctive relief and deny the motion to dismiss.  The court disagrees.  Defendants are the moving party and they bear the burden of showing that continuing injunctive relief would be inequitable.  18 U.S.C. 3626 (b)(3) states that "Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation."  Contrary to defendant's contentions, this is a standard of review, not a shifting of the burden of proof.  Gilmore v California, 220 F.3d 987 (9th Cir. 2000).

Defendants cite Mayweathers v. Newland, 258 F.3d. 930 (9th Cir. 2001).  In Mayweathers plaintiffs brought a motion to renew an injunction.  The burden was placed on the moving party. Defendants cite Hallett v. Morgan, 296 F.3d 732, 741-45 (9th Cir. 2002).  In that case inmates sought to extend jurisdiction over a decree that was about to expire. The moving party again had the burden of proof.  Defendants cite to Guajardo v. Texas Dept. Criminal Justice, 363 F.3d 392 (5th Cir. 2004).  A Fifth Circuit case is not binding precedent on this court.  Further, in Guajardo the motion was brought pursuant to 18 U.S.C. 3626 (b)(1)(iii) where the defendants had waited two years since the grant of the injunctive relief or enactment of the statute.  The case does not address a dismissal under 18 U.S.C. 3626 (b)(2) and is not directly on point.

Defendants do cite to cases on point.  Osterback v. McDonough, 549 F. Supp. 2d, 1337 (M.D. Fla 2008); Imprisoned Citizens Union v. Shapp, 11 F.Supp. 2d 586 (E.D. Pa. 12998).  Again the cases are not controlling authority.

Plaintiffs argue the moving party has the burden of proof and cite Gilmore v California, 220 F.3d 987 (9th Cir. 2000).  Like the current litigation, the Gilmore case deals with a motion to terminate a consent decree made pursuant to 18 U.S.C. 3626 (b)(2).  The court stated:

> Obviously, the PLRA creates a more exacting standard for federal courts to follow. But the standard does not eviscerate a district court's equitable discretion and thereby prescribe a rule of decision. **First, nothing in the termination provisions can be said to shift the burden of proof from the party seeking to terminate the prospective relief**. Second, and more importantly, although § 3626(b)(2) speaks of "immediate termination," and although § 3626(e)(1) requires a "prompt" ruling, a district court cannot terminate prospective relief without determining whether the existing relief (in whole or in part) exceeds the constitutional minimum. And, consistent with § 3626(b)(3), a district court cannot terminate or refuse to grant prospective relief necessary to correct a current and ongoing violation, so long as the relief is tailored to the constitutional minimum. Thus, unless plaintiffs do not contest defendants' showing that there is no current and ongoing violation under § 3626(b)(3), **the court must inquire into current conditions at a prison before ruling on a motion to terminate.**

Gilmore v. People of the State of California, 220 F.3d 987, 1007-1008 (9th Cir. 2000) (emphasis added).  This is controlling precedent in this circuit.  Further, plaintiffs have provided supplemental authority where the court specifically assigned the burden of proof to the party moving to dissolve the injunction (Dkt. # 354).  Graves v. Arpaio, decided October 13, 2010, under Ninth Circuit cause number 08-17601.  This is the controlling precedent for this court.  The court finds defendant's argument that the holding in Graves is dicta disingenuous (Dkt. # 355).

The issue of who has the burden is far less important than the parties contend.  Having reviewed the record and heard the arguments of counsel, assignment of the burden of proof to the plaintiffs would not alter the recommendation of the undersigned.

REPORT AND RECOMMENDATION 6

1

Procedural history leading to this motion

2

Following class certification on May 12, 1995, the parties worked harmoniously resolving

3

issues and ultimately stipulating to the aforementioned consent decree and subsequent amendments

4

in1998, 2001, and 2009.   Thus, as of this writing, the court has never been asked to make findings

5

of fact regarding any ongoing constitutional violation.   The court recognized the parties were

6

getting closer to final resolution in this case and ordered mediation of the remaining issues prior to

7

December of 2009 (Dkt. # 274).  That mediation resulted in the current settlement agreement (Dkt.

8

# 284).  A status conference held May 17, 2010, resulted in a minute order which stated that if this

9

matter was not resolved by October 15, 2010, mediation was to occur on or before November 15,

10

2010 (Dkt. # 302).  That order also set a trial date for January 11, 2011 (Dkt. # 302).

11

On August 10, 2010, the court monitor filed her latest report (Dkt. # 312).  The monitor

12

noted four areas of disagreement; Medical Kites, Refusal of Care, Privacy of Nursing Interviews at

13

Reception, and Management of Alcohol Withdrawal (Dkt. # 312).  This report resulted in a flurry of

14

letters between the defendants and the monitor in which the county offered to take certain steps in an

15

attempt to resolve the monitor's concerns.  While the defendants' counsel have proffered that these

16

changes have taken place or are taking place, the court monitor has not been able to confirm the

17

changes as of this date.   On August 30, 2010, the county demanded responses to their letters to the

18

monitor by September 1, 2010, and on September 2, 2010, the county filed this motion (Dkt. # 316).

19

On September 1, 2010, plaintiffs' counsel informed the court that the court ordered

20

mediation is scheduled for October 22, 2010 (Dkt. # 315).

21

STANDARD OF REVIEW

22

The standard of review is set forth in 18 U.S.C. 3626 (b) (3):

23

Prospective relief shall not terminate if the court makes written
findings based on the record that prospective relief remains necessary to

24

25

26

REPORT AND RECOMMENDATION 7

correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

## DISCUSSION

The court monitor and the parties agree that four of the ten issues the parties identified in the 2009 stipulated order are no longer at issue.  They are as follows:

1.      Segregation Rounds.

2.      Response to Mental Health Kites.

3.      Training of Custody Staff Performing Reception Screening.

4.      Mental Health Referrals from Booking.

(Dkt. # 312, page 5).  The monitor's report does address mental health referrals from booking as an issue (Dkt. # 312, pages 16 to 22).  The monitor reported the policy in place regarding mental health referrals is adequate, but that it needs to be reinforced and fully implemented. Upon confirmation by the monitor that implementation has occurred, ***the undersigned recommends granting defendants' motion to dismiss these issues***.

The court will next address:

5.      Responses to Medical Kites.

6.      Refusal of Health Care (written).

7.      Continuing Quality Improvement Committee.

Over the years the parties have focused on changes that needed to be made to bring health care at the jail up to minimum constitutional standards.  The focus of the discussion has shifted from curing a constitutional violation to placing policies and/or protocols in place to ensure a constitutional standard of care.  This shift in focus has resulted in demands being made of the defendants that are not specifically mandated by the constitution. The court is mindful that injunctive relief must be no

REPORT AND RECOMMENDATION 8

1   greater than needed to cure a constitutional violation.  This principle is specifically embodied in the

2   standard of review set forth above.

3       The Eighth Amendment to the United States Constitution prohibits deliberate indifference to

4   serious medical needs of prisoners. To state a claim of cruel and unusual punishment, plaintiff must

5   satisfy two requirements: First, the deprivation alleged must be, objectively, sufficiently serious.

6   The inmate must show that he is incarcerated under conditions posing a substantial risk of serious

7   harm.  Farmer v. Brennan, 511 U.S. 825 (1994).  Second, the prison official must have a sufficiently

8   culpable state of mind. That state of mind is one of deliberate indifference to inmate health or safety.

9   Id. With this standard in mind the court examines the remaining issues.

10      A.      Responses to Medical Kites.

11      The constitution does not prohibit medical staff from responding to questions or requests for

12  care by reverse kite.  A reverse kite is where a request is received in writing by medical staff and,

13  instead of scheduling an appointment, medical staff responds in writing. While there may be a risk

14  that a person who needs to be seen may experience a delay because of a reverse kite, the plaintiffs

15  have come forward with no evidence to show any prisoner was placed at risk or injured by this

16  practice.  The medical records have been examined by the court monitor and plaintiffs' counsel.  If

17  the practice had resulted in a serious risk of bodily harm, evidence would be readily available.

18  **The undersigned recommends granting defendants' motion to dismiss this issue**.

19      B.      Refusal of Health Care (written).

20      The court monitor seeks to require the jail to obtain written refusals of care when a prisoner

21  refuses to take medication or attend an appointment.  The United States Constitution allows a

22  prisoner to refuse medical care in most cases.  Of its own force the Constitution does not mandate a

23  written refusal be obtained.  The court understands that obtaining a written refusal assures that the

REPORT AND RECOMMENDATION 9

prisoner has in fact chosen not to take the medication or attend the appointment, as opposed to the inmate being in court, being asleep, or being in some other part of the facility and being unaware that medical personnel were seeking him/her. The fact remains that there is nothing in the record to show any prisoner has been injured by the practice of not obtaining the written refusal.

The monitor's report does contain information about a prisoner suffering from a MRSA infection who did not attend a clinic appointment because medication was being handed out at the same time and he feared he would not get his medication if he attended the appointment (Dkt. # 312, page 12).  He decided to take his medication as ordered rather than going to the clinic. This was recorded as a refusal.  Obtaining a signed refusal does not cure this type of problem.  At oral argument counsel represented that an inmate could obtain his medication in the clinic under this set of facts.  The court accepts this proffer of proof absent evidence to the contrary.  While the jail should certainly have a system in place to ensure that inmates who are out to court or at the clinic receive their scheduled medications, especially critical medication, the practice of obtaining signed refusals does not address the problem.  ***The undersigned recommends granting defendants' motion to dismiss this issue***.

C.     Continued Quality Improvement Committee.

This committee does not provide health care to prisoners.  Instead it reviews actions taken, reviews critical events after the fact, and makes recommendations to improve the quality of care.  The county agreed to the establishment of a Quality Improvement Committee and it did so.  The specific functions of the committee are not of constitutional significance.  While the committee is undoubtedly beneficial in improving the standard of care, the court does not find any ongoing constitutional violation directly related to a function of the committee.  ***The undersigned recommends granting defendants' motion to dismiss this issue.***

This leaves three issues to address:

8.  Privacy at Intake.

9.  Chronic Disease Care.

10.  Alcohol Withdrawal Monitoring.

A.      Privacy at Intake and Chronic Disease Care.

These two issues merge under the court's analysis. The written findings, based on the record, that prospective relief remains necessary to correct a current and ongoing violation of a Federal right should reflect the case of Mr. Merritt (Dkt. # 325, Affidavit of Mr. Speir who reviewed the records and reports his conclusions to the court).  Mr. Merritt suffers from a number of ailments, but it is sufficient to say he has a condition that causes his body to produce or be unable to adequately rid itself of ammonia without proper medication.  He takes a number of medications to control his medical condition and stabilize his mental condition.  He was admitted on November 17, 2009.  The day after booking, Mr. Merritt was seen by medical staff and blood work was begun.  This indicates to the court there was some concern at the time of booking.

Thus, prison officials were aware of Mr. Merritt's condition.  On November 21, 2009, Mr. Merritt was in critical condition and he was transferred to Tacoma General Hospital where he spent the next four days (Dkt. # 325, affidavit of Mr. Speir, page three).  At oral argument defendants' counsel represented to the court that the jail does not provide critical patient care, and inmates needing that care are sent to a hospital or emergency room.  Mr. Merritt was stabilized and returned to the Jail.  Despite the fact that failure to have his medication results in a critical life threatening condition and altered mental condition,  Mr. Merritt did not receive adequate amounts of his medications.  Eight days after he was re-admitted to the jail, he was again taken to a hospital, St Joseph's, where he spent two days being stabilized, from December 3 to December 5. Id.

After St. Joseph's returned Mr. Merritt to the jail he again did not receive adequate doses of his medication, and only three days after he returned to the jail he was again sent to St. Joseph's hospital. Id. He was hospitalized on December 8 and 9. After his return to the jail he yet again did not receive needed adequate medical attention for his serious medical condition, and on December 12 he was sent to Tacoma General Hospital where he spent the days of December 12 and 13. Id.

Upon release back to the jail, the health care system at the Pierce County Jail was still unable to keep Mr. Merritt's ammonia levels in check. He was sent to St. Joseph's hospital on December 20 for one day. He was back in Jail on December 21, but had to be returned to St. Joseph's on the 25th of December, this time for a five day stay.

Mr. Merritt's plight did not end with the new year. On January 5 and 6, 2010, he was again in Tacoma General Hospital. The Tacoma General Staff noted:

> The patient is unable to provide any history during this time due to his altered mental status and combativeness. Information is obtained from Pierce County Jail Staff, the emergency room physician and the medical record. This 53-year-old white male with a history of alcohol cirrhosis with hepatic encephalopathy. Last episode requiring hospitalization 20 days before that was admitted for the same. I discussed the case with clinic staff with Pierce County Jail and they suspect that the patient is diverting his lactulose but they are unable to prove it. It appears he improves quickly in the hospital with treatment and his[sic] fine in jail for a while…

> DISPOSITION: we will need to coordinate with the Pierce County Jail a strategy to ensure patient gets lactulose to avoid these recurrent admissions that ideally should be dealt with as an outpatient. I am going to recommend upon discharge that we discuss with Pierce County Jail not only observing him taking the lactulose but consider observing him closely for 30 minutes after he ingests the lactulose in order to ensure compliance.

(Dkt. # 325, affidavit of Mr. Speir, page four). The failure of the Jail staff to provide the information that this prisoner had also been sent to St. Joseph Hospital and that the problem was occurring on a much quicker cycle than staff at Tacoma General believed is shocking. In fact it had not been 20 days since Mr. Merritt's last admittance for this problem, it had only been five. At

1
2
3
the time of admittance the record reflect  Mr. Merritt to be in an altered mental state, unable to

provide his own history.  By necessity he had to rely on jail medical staff to relay treatment

information to health care providers at the hospital.

The Tacoma General disposition note shows Pierce County Jail officials being placed on

specific notice by a health care provider that remedial action had to occur and that there was a

problem with continuity of care for prisoners who were seen at outside facilities.  The information

was ignored.  Two days after Mr. Merrit was returned to the jail he was again sent to a hospital, but

the name of the hospital is not in the record. Id.  Further, from January 10 to the 14, Mr. Merritt

was in St Joseph hospital.  St. Joseph's discharge instructions state:

> Patient is expected to be followed at The County Jail by the physician.  The
> patient has also been counseled extensively on the importance of being compliant
> with his medication and refraining from taking any street drugs.

Id. Thus, the Pierce County Jail health care system was again notified of a problem with the

continuity of care.  Despite other health care entities providing this information,  the plaintiffs

contend that between January 15 and January 31, 2010, eleven doses of medication were "missed."

Five more doses of medication were "missed" between February 6, and February 10, 2010.

At oral argument counsel represented the situation described above was at most negligence,

and an isolated incident.  They further argue that policies have been changed.  If the situation had

only happened once or twice the court would be inclined to agree with counsel's characterization

of the events as negligence, but here, Mr. Merritt was sent from the jail to a hospital no less than

eleven times.  Further, even after two separate health care facilities had informed medical staff of

the problem, multiple doses of the medication were "missed" and the problem continued.  The

failure of the Pierce County Jail health system, or persons working in the system, to recognize and

treat a serious medical need rose to the level of deliberate indifference.  This is not simply

REPORT AND RECOMMENDATION
13

1    negligence, it is symptomatic of a dysfunction in a health care system that does not properly track

2    and assure critical medication compliance.  Because of the limited record and lack of testimony,

3    the court is not in a position to determine if the system failure is in intake, admitting, booking,

4    chronic care, or some other aspect of the jail.

5           The fact that important treatment information regarding prior hospital visits and emergency

6    room calls was apparently not shared with staff at Tacoma General is also deeply troubling.  These

7    specific findings demonstrate an ongoing violation of prisoners' Eighth Amendment right to

8    medical care.  The situation warrants continued monitoring and injunctive relief.

9

10          While defendants aver changes have been made, the effect of those changes has not been

11   documented and the court would be abrogating its duty to protect constitutional rights if it merely

12   accepted counsel's assurances.  Until further proceedings are held the court is not in a position to

13   fashion relief that extends no further than necessary to correct the violation of prisoners'  Eighth

14   Amendment right to medical care.  Further the court must ensure any relief ordered is narrowly

15   drawn and the least intrusive means to correct the violation.  The remedy should be fashioned after

16   an evidentiary hearing or full trial where all the facts are before the tribunal and the court does not

17   rely on a partial record, hastily compiled to respond to a motion.  Clearly issues of fact preclude

18   termination of the consent decree.

19

20          The failure at intake or booking to identify persons in need of chronic care treatment or

21   mental health treatment is further exemplified by a suicide that occurred only six days before the

22   motion to terminate the decree was filed.  The record reflects a person arrested on DUI was

23   screened and a history of depression was noted (Dkt. # 327, exhibit 2).  Within hours this person

24   had committed suicide while in the Pierce County Jail.  This incident touches on intake and mental

health treatment at the jail.  Questions of fact remain unresolved.  Further fact finding and hearings will be needed to determine what, if any, injunctive relief is needed.

The record placed before this court by plaintiffs shows thirty-two deaths have occurred at the jail between 1998 and 2010 (Dkt. # 327 Exhibit 5).  The court recognizes that many of these deaths were from natural causes and would happen in any setting.  The court also recognizes that after each event the facts were analyzed and corrective actions taken.  The fact remains that the number of suicides by hanging is sixteen and suicide by hanging is the leading cause of death at the Pierce County Jail.

The court concludes that suicide by hanging is not an isolated incident at the Pierce County Jail.  The most recent suicide by hanging occurred five days before the motion to terminate was filed.  Even if plaintiffs have the burden of proof, the record shows questions of fact preclude termination of the consent decree.  Unless the parties are able to mediate a solution to these issues and the court monitor can implement a plan, a trial or evidentiary hearing to make a full record and fashion appropriate injunctive relief is recommended.

It appears to the court that chronic care spans the other discreet issues.  This makes problematic addressing the issue of "chronic care" in a vacuum.   Before the court is a motion to terminate a consent decree.  This motion places the court into a role of exercising its equitable powers.  To date, the parties have been able to stipulate to the next course of action.  The court has the power and duty to modify or alter a consent decree to cure violations of constitutional rights.  Gilmore v. People of the State of California, 220 F.3d 987, 999-1000 (9th Cir. 2000).  The contested motion to terminate the decree changes the status quo.  The court must also ensure that whatever remedy it puts in place is the least intrusive means necessary to cure the violation.  The record before this court is not complete enough for the court to fashion a remedy.  Additional

1
2
hearings or trial are recommended. ***The undersigned recommends denial of defendants' motion to dismiss these issues.***

3
        B.    <u>Alcohol Withdrawal Monitoring</u>.

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
        Plaintiffs have placed before the court the affidavit of Dr. Goldenson (Dkt. # 326).  Dr. Goldenson is familiar with the Pierce County Jail and was a court monitor at one point in the history of this consent decree.  Dr. Goldenson states that alcohol withdrawal is a serious condition and can be life threatening if not appropriately monitored and treated (Dkt. # 326, page 2).  This court recommends that fact be included in any written findings made by the court.  According to the Doctor, persons going through alcohol withdrawal may face altered mental status, electrolyte imbalances, seizures, delirium tremens, dehydration, and death.  The Doctor's affidavit states that his February 2009 report documented two deaths from alcohol withdrawal that occurred at the jail.  Dr. Goldenson's opinion was that these two cases highlighted deficiencies in how the jail monitors at risk prisoners (Dkt. # 326, page 3). He also documented five other cases with withdrawal monitoring shortcomings (Dkt. # 326, page 3). In one case a prisoner in November of 2009 had a known seizure disorder.  After he went into seizure the jail medical staff agreed the seizure was likely due to alcohol withdrawal.  Prisoner had not been placed on monitoring.  This issue could be termed either a failure to monitor or a shortcoming at intake.

20
21
22
23
        The doctor also notes that an urban jail population is at greater risk for alcohol withdrawal than the general public and that alcohol withdrawal presents a greater risk of death than drug withdrawal.  Clearly alcohol withdrawal is a serious medical condition.

24
25
26
        The jail complains that despite the risk of death to this high risk population, it is impossible to make a medical assessment of this small group of prisoners who are on alcohol monitoring, once every eight hours (three times a day).  The court has reviewed the mortality reviews attached to

REPORT AND RECOMMENDATION

Mr. Diamondstone's affidavit (Dkt. # 327, Exhibit 6).  In one case a prisoner on alcohol

monitoring was observed by corrections staff to be "having emesis" (vomiting), at 3 a.m.  Vital

signs had been taken and medication and hydration given at 11:00 p.m. the night before.  At 5 a.m.

the prisoner was dead (Dkt. # 327, Exhibit 6, review for the death occurring June 25, 2008).

Dr. Goldenson's affidavit discloses another case where a prisoner was placed on alcohol

withdrawal monitoring but removed less than seventy-two hours later because no signs of

withdrawal were seen.  Ninety-two hours after admission to the Pierce County Jail the prisoner

was observed to be confused and disoriented.  He was treated but his condition worsened until he

was finally sent to an emergency room where he was treated for delirium tremens (Dkt. # 326,

page 4). The Doctor opines that alcohol withdrawal requires monitoring every six to eight hours.

The court agrees.

At oral argument and in briefing, the defendants argue it is impossible to comply with the

requirement that this group of prisoners be medically assessed three times a day.  They do not

specifically say why it is impossible.  Is the staffing level too low or are the prisoners unavailable

for monitoring?  Counsel also argues that other facilities may only make a medical assessment

once a day and this is constitutional.  This argument is of little value to the court because the

defendants do not inform the court what other protocols or policies those facilities have in place

that augment or compliment medical assessment for prisoners on alcohol withdrawal monitoring.

By way of example, in some facilities inmates placed on suicide watch or on monitoring may be

observed by custody staff every fifteen minutes.  In fact prisoners placed on dry cell watch for

penological reasons may be under constant observation.  Those facilities may have protocols or

policies that require custody staff to call medical if there is any change in the prisoner's condition.

The other facilities may have protocols or policies that require an inperson medical assessment

1   immediately after medical staff are called by custody staff.  Without this other information and a

2   complete record, the fact that medical assessment  occurs only once a day in a different facility is

3   not that meaningful.

4        Here, the court has a record that shows correctional staff observed a prisoner who was on

5   alcohol withdrawal monitoring vomiting at 3:00 a.m.,  but there is nothing in the record to show

6   that information was promptly given to medical staff or that there was any protocol in place

7   regarding what should have occurred.  The prisoner was dead two hours later. The court has

8   serious questions regarding the adequacy of alcohol withdrawal monitoring at the Pierce County

9   Jail.  Failure to provide adequate medical care in that case was the failure to adequately treat a

10  serious medical need that medical staff had identified.  This was an Eighth Amendment violation.

11       The parties have not argued in the briefing what changes have occurred since this death in

12  2008.  Therefore, the court is not in a position to fashion a remedy.  It may be that three times a

13  day medical assessment along with hourly observations by custody staff and a protocol or policy to

14  report any changes in the prisoner's condition will suffice.  The court monitor, Judith Cox,

15  emphasizes the need for monitoring once each 8 hour shift, as opposed to three times in a 24 hour

16  period.  It may be that the current jail medical system is unable to adequately address alcohol

17  withdrawal and persons at risk may need outside monitoring.  Expert testimony will be needed on

18  this subject. The court should not be placed in the position of trying to fashion a remedy without a

19  full record.  Further, in fashioning a remedy the court must again be mindful not to exceed the

20  constitutionally required minimum.  Here, the Eighth Amendment proscribes that minimum.  The

21  Eighth Amendment is violated if society considers the conduct at issue to be so grave that it

22  violates contemporary standards of decency to expose anyone unwillingly to those acts.  Helling v.

REPORT AND RECOMMENDATION
18

McKinney, 509 U.S. 25, (1993).  **The undersigned recommends denial of defendants' motion to dismiss this issue.**

### R E C O M M E N D A T I O N

The court recommends the motion to dissolve the consent decree be GRANTED IN PART AND DENIED IN PART AS HEREAFTER SET FORTH.

1) **Upon confirmation by the monitor that implementation has occurred regarding Mental Health Referrals,  defendants' motion to dismiss should be granted**.

2)  **Defendants' motion to dismiss the issues of (a) Segregation Rounds; (b) Response to Medical Health Kites; (c)Training of Custody Staff  Performing Reception Screening; and (d) Response to Mental Kites should be granted.**

3) **Defendants' motion to dismiss the issue of Written Refusal of Care should be granted.**

4) **Defendants' motion to dismiss the issue of Continued Quality Care should be granted.**

5)  **Defendants' motion to dismiss the issues of Assessment at Intake, Chronic Disease Care, and Management of Alcohol Withdrawal, should be denied.**

6) **The automatic stay of injunctive relief should be postponed until at least December 1, 2010.**

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. See also, Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the matter for consideration on October 28, 2010, as noted in the caption.

Dated this 15th day of October, 2010.

*/s/ J. Kelley Arnold*
J. Kelley Arnold
United States Magistrate Judge

REPORT AND RECOMMENDATION
19