Judith F. Cox  7 Locust lane Clifton Park, New York  12065
518-505-2669   cox@nycap.rr.com

February 22, 2011

Honorable Robert J. Bryan
Honorable J. Kelley Arnold
Union Station Courthouse
1717 Pacific Avenue, Room 3100
Tacoma, WA 98402-3200

Re: Court Monitors 2/22/11 Report: Sandra Herrera, et al. v. Pierce County, et al. United States District Court(Progress towards Settlement Compliance)

Dear Judge Bryan and Judge Arnold:

Enclosed is my report on the progress towards settlement compliance in Herrera vs. Pierce County. The agreement, as initialed by Attorneys Dan Hamilton and Fred Diamondstone, was reached on 10/22/10.

It is my opinion that the healthcare staffs at the Pierce County Detention and Corrections Center have met the terms of this agreement. My report provides data to support these findings. However, I want to bring to your attention that much of this data was gathered though a quality improvement effort at the facility under the medical director and the director of nursing.

Like any correctional facility, across the county, this facility still faces challenges in health care and will need community support. However I do believe they have met the terms agreed to on 10/22/10.

Please contact me if you have any questions or need anything on this matter.

Sincerely,

Judith F. Cox

**95-CV-09025-STMT**

Pierce County Detention & Corrections Center

Sandra Herrera, et al. v. Pierce County, et al.
United States District Court
(Progress towards Settlement Compliance)

Submitted by: Judith F. Cox, MA  Court Monitor

February 22, 2011

This is the second progress report of the Court Monitor Judith F. Cox on the status of health care services at the Pierce County Detention and Corrections Center (PCDCC) in Tacoma Washington. It describes the progress which has been made towards compliance with a settlement agreement negotiated on October 22, 2011 .The settlement agreement addresses Judge's Arnold's 10/15/10 Report and Recommendations Case NO. C95-5025RJB/JKA following a hearing conducted on 10/12/10 on the County's Motion to Terminate the Consent Decree in the Herrera matter.

In the October 22, 2010 settlement agreement all parties agreed to terms regarding issues related to assessment at booking, chronic care and alcohol withdrawal

This report is based on observations made during my second monitoring visit to the PCDCC and through a review of documents and patient charts as well as conference calls with the health staff at the facility. During the site visit I observed the intake screenings process and conducted interviews with staff and inmates.

### FINDINGS
It is my opinion that the terms of the October 22, 2010 agreement have been reached. What follows is my evaluation of the progress that has been made at the PCDCC in achieving the terms of this settlement agreement and my response to concerns raised by Plaintiff's Counsel following the settlement agreement.

### ASSESSMENT AT BOOKING
The settlement agreement stipulates requirements for privacy at booking and suicide screening.

PRIVACY AT BOOKING: There are two terms under privacy at booking:
1) *Monitor Judith Cox will look at photographs of installed privacy area, view videotape of interview process and discuss by telephone with Dr. Balderrama to confirm that her requirements for privacy have been satisfied. Plaintiff's counsel shall have the opportunity to inspect the booking area prior to the monitor's assessment.*
2) *arresting officers during medical screenings at booking must stand outside the taped area at booking station one and respect the confidentiality of the medial screening process*

On 1/9/11-/11/11/11  I conducted a monitoring visit to the PCDCC and evaluated the new privacy structure created for receiving screening.  The pictures shown below illustrate the area in which intake health care screening is conducted. The first picture illustrates where the officer sits when administering the receiving screening.  It also illustrates  the area where the booking nurse  screened inmates prior to the changes illustrated in pictures #2 and #3.

Picture # 1



2

The area, which the booking nurse now uses for medical screening is the booth next to the intake officer. The inmate walks around the pole into the medical screening area. Pictures 2 and 3 illustrate this area and a nurse administering the medical screen. There is a now Plexiglas screen, which facilitates privacy. Picture # 2 also illustrates a group of folders on the shelve. These folders contain all of the screening forms that the nurse would need pending her initial findings including the Mental Health Booking Screening Form and the Suicide Assessment Screening Tool For Those Inmates Anticipating Opiate Withdrawal.



Picture #2



Picture # 3

During the January 2011 monitoring visit I observed five inmates screened by the booking officer and then by the booking nurse. In all cases the screenings were conducted with privacy and in a professional manner. Changes to facilitate privacy were also made in regard to the postion of the arresting officer during the medical screening process. In the past the arresting officer often stood near the booking officer or nurse completing the health screenings. Now they observe from an enclosed glassed area, which is across from the booking officer in picture #1 . This insures privacy for the medical screenings provided at intake and the availability of the arresting officer should the need arise. During the above five screenings the police officers were respectful of this screening process and maintained the confidentiality of the medical screening process.

Interviews with health care and security staff (the medical director, director of nursing, three booking officers, two booking nurses, one sergeant and one lieutenant) confirmed staff felt the intake medical screenings were now conducted in a setting that afforded privacy and the changes made have enhanced the screening process.

3

SUICIDE SCREENING: The settlement agreement under suicide screening was that Judith Snow, Judith Cox, *Dr. Ronald Shansky, and Dr. Balderrama would agree by November 5, 2011 upon a form that complies with minimum constitutional standards.*

The PCDCC has complied with this section of the settlement agreement. A telephonic conference was held on 11/2/10 involving the above parties. Agreement was reached on the suicide screening process and forms, which met constitutional standards. All parties agreed to a process that involves the use of three forms:
1. *Jail Health Receiving Screening Form*: this form is administered by the booking officer. Inmates with positive mental health findings are then referred to the booking nurse for a more comprehensive screening.
2. Mental *Health Booking Screening Form*: this form is administered by the booking nurse to inmates for whom the nurse believes are suicidal or have a serous mental illness.
3. Suicide *Assessment Screening Tool For Those Inmates Anticipating Opiate Withdrawal:* This form was recently developed and is used by the booking nurse to detect suicide risk among inmates screened at risk of opiate withdrawal.

Positive findings by the nurses on these forms results in a comprehensive screening and/or assessment by mental heath staff. It is my opinion that the suicide screening process with the use of these forms is in compliance with both the National Commission of Correctional Health Care Standards (J-G-05 Suicide Prevention Program-Identification) and the American Correctional Association (Mental Health Screen 4-aldf-4c-29)

To look at PCDCC compliance with the above suicide risk screening process I reviewed the booking rejection list for 12/1/10-1/7/11 and data on utilization of the above three screening forms.

(Booking Rejection List): I reviewed the booking rejection sheet at the PCDCC for the period 12/1/10 – 1/7/11. There were approximately 69 inmates rejected from confinement at the PCDCC for this period due to serious health care concerns. Two of these rejections were inmates who were at high risk of suicide and other serious medical complications. One rejection was for swallowing 6 pills and the other was for a possible over dose. In addition there were several rejections related to acute intoxication. It is a good practice to reject these individuals from the jail setting as they are not only at greater risk of serious medical complications but they are also at higher risk of suicide.

(Review of Suicide Screening Forms):I reviewed the Jail Health Receiving Screening forms of all 72 inmates booked on 1/ 6/11 to determine if the booking nurses had screened those inmates the booking officers had identified with positive mental health indicators. My findings were very positive:

- Approximately 39% of all persons booked into the PCDCC on 1/6/11 (N=28) were screened by a booking officer as having positive health (medical &/or MH) findings and all were screened again by the booking nurse.

4

- Approximately 22% of all persons (N=16) booked into the PCDCC were screened by the booking officer as having positive mental health findings.
- The nurse deposition for these 16 inmates was as follows: <u>one</u> inmate was rejected for facility admission, <u>seven</u> inmates were referred to MH & their receiving screening forms were faxed to Mental health , <u>one</u> inmate was seen by MH in booking, one inmate was referred as urgent to PA due to heroin use, and <u>seven inmates</u> were screened by nursing and not referred to MH
- Five of the above 16 inmates were also identified as being at risk of suicide or at risk of opiate withdrawal These inmates were appropriately administered the suicide assessment screen for opiate withdrawal (w/d) and/or the mental health booking screening forms.

I also reviewed data on the volume of Receiving Screening forms and Mental Health Booking Screening forms (Table 1) faxed by booking nurses to mental health as a percentage of total bookings provided to me for the month of December 2010.

| Table 1: Receiving Screening & Mental Health Booking Screening forms Faxed to Mental Health by Booking Nursing during December 2010 | | | |
|---|---|---|---|
| Month | Total bookings | # Receiving Screening Forms | # MH Screening Forms |
| 12/10 | 1970 | 197  (10%) | 111 (.056) |

As illustrated in Table 1, ten percent of all receiving screening forms on inmates booked into the PCDCC in December were faxed by nurses to mental health. Additionally the Mental Health Booking Screening Form was administered to approximately 6% of inmates booked during this timeframe and it was faxed to mental health staff. This represents a substantial increase from the data I reviewed for May 2010 and June 2010 when I prepared the August 2010 report to the Court. During June 2010 PCDCC data previously provided by PCDCC mental health staff showed nurses faxed 27 receiving screening sheets and 29 MH screening forms to mental health staff. In June 2010 they faxed 30 receiving screening forms and 23 MH screening forms to mental health staff . The number of these forms sent to mental health in December 2010 suggests a significant growth in mental health referrals from booking nurses and progress in the detection in booking of inmates at risk of suicide or serious mental health problems.

In summary the setting for intake screening at the PCDCC now provides privacy for health screening and arresting officers are respecting the medical confidentiality of the screening process. Nurses are seeing inmates identified by officers with positive findings . There is also evidence that they are using the opiate suicide screening form for heroin cases and the Mental Health Booking Screening form and that the volume of nursing referrals to mental health staff has increased.

5

CHRONIC CARE
The Settlement agreement specified the following terms:
   A. *The Booking Nurse Guidelines will be revised as follows:*
     *a. The medication nurse will conduct a face-to-face encounter with the inmate where critical medication is involved. This means the inmate must refuse to the nurse's face." Examples on non-Critical Medications (Non exclusive)" are listed in the booking nurse guideline.*
     *b. The above lists are always subject to clinical judgment based on individual inmate circumstances*
     *c. When medications are not administered the reason will be documented.*

   B. *Upon return form the hospital or emergency room an inmate will see a clinician within 24 hours, except on weekends and holidays at which time they will be seen within 24 hours by a nurse and on the next day by a clinician (P.A. and physician will be on call 24/7).*

(Critical medications):The nursing guidelines have been revised to include the changes specified in the stipulation agreement regarding continuity for critical medications. To look at compliance with the above guidelines I reviewed patient charts and QI studies conducted by the health staff at the facility to evaluate their own progress in meeting the guidelines.

I first looked data(Table 2) from at a study involving inmates booked into the PCDCC on four separate twenty-four hour periods between December 2010 and January 2011. This study was conducted under the direction of the medical director and the director of nursing. There were a total of 298 booking for these four periods(1/4- 1/ 5 /11, 12/ 28/-12/29/10, 12/ 14 – 12/15/10 & 12/ 20-12/21/10). The booking sheets of inmates booked during this period were reviewed by the PCDCC QI nurse. It was found that 61 of these booking sheets indicated that the inmate needed medication or had another health care issue and 237of the bookings had no positive health care findings. These sixty-one booking forms were then reviewed along with inmate's charts to verify the facility's practice with managing inmates on the critical medications at booking.

| Table 2: Continuity of Critical Medications Identified at Booking: BF=booking form, BN=booking nurse CM=critical meds NCM- noncritical meds, FF=face to face visit ||||||
|---|---|---|---|---|---|
| Study periods & Total Bookings | # BF forms with Medication health care issues reviewed by the BN | BN verification as to total in column #2 who needed CM vs. NCM | # inmates in column who received FF visits from BN & # of CM inmates | Inmate continued on same CM | Medication changed and documented |
| 1/ 4-1/5/11 | N=20 | CM=10 NCM=2 | Total: 19 inmates includes all 10 CM | 9 | 1 w/ provider order |
| 12/ 28/-12/29/10 | N=11 | CM=7 NCM=2 | Total: 9 inmates includes all 7 CM | 7 | No change |
| 12/ 14 – 12/15/10 | N=12 | CM=9 NCM=1 | Total: 11inmates includes all 9 CM | 9 | No change |
| 12/ 20-12/21/10 | N=18 | CM= 7 NCM =7 | Total: 16 includes all 7 CM | 6 | 1 w/ provider order |
| 298 Bookings | Total 61 | CM= 33 NCM= 12 | Total: 55 All 33 CM | 31 | 100% |

The results of this study illustrate compliance with the stipulation agreement. They are:
- Booking nurses reviewed the receiving screening forms for all inmates who indicated

6

they were on medications in booking
- Booking nurse conducted face to face visits on all approximately 90% of all inmates who indicated they were on any type medication at booking which include 100% of those on critical medication.
- Critical medications were not changed unless ordered by a PA or MD and documented in the chart. In this study only two patients had medications changed. The change was ordered by a facility provider and documented. In one case the medication was changed as methadone is not administered at the facility. In the other case klonopin to valium.

CONTINUITY UPON RELEASE FORM HOSPITAL: To evaluate compliance with this component of the stipulation agreement I reviewed the on-call provider list for November 2010 and the charts of inmates released from the hospital to PCDCC in November 2010.

On-call list-As verified by the director of nursing and the facility medical director a current monthly on call provider list is maintained and the physician assistants on this list are responsive to calls from nursing and other staff . Table 3 illustrates the on-call list , which existed for November 2010.

| Physician Assistant Call schedule for November 2010 Ken Fleck (KF) Carlos Ortiz ( CO ) & Juliette Pohl-Y-Baca (JP) |||
|---|---|---|
| Nov 1  KF | Nov 11 CO | Nov 21 KF |
| Nov 2  KF | Nov 12 CO | Nov 22 CO |
| Nov 3  CO | Nov 13 CO | Nov 23 KF |
| Nov 4  CO | Nov 14 CO | Nov 24 KF |
| Nov 5  CO | Nov 15 JP | Nov 25 KF |
| Nov 6  CO | Nov 16 JP | Nov 26 KF |
| Nov 7  CO | Nov 17 KF | Nov 27 KF |
| Nov 8  KF | Nov 18 KF | Nov 28 KF |
| Nov 9  KF | Nov 19 KF | Nov 29 JP |
| Nov 10 CO | Nov 20 KF | Nov 30 JP |

(Hospital releases): The charts of all inmates transported to the hospital in November 2010 and a QI study were reviewed to determine when inmates were seen by nursing and provider staff upon the their release back to the PCDCC and to track compliance with the inmate's hospital discharge plan. During November 2010 there were twenty PCDCC transports to the hospital. This represented 18 individuals as two patients went twice to the hospital during this month. The data presented in Table 4 , shows continuity of care was provided for these patients.

| Table 4: Continuity of Health Care at PCDCC for Inmates Transported to Hospital from PCDCC during November 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Action following hospital release | Released from Hosp. to Community | Seen by nurse w/in timeframe specified in guidelines | Seen by provider w/in timeframe specified in guidelines | Released from jail w/in 24 hrs | Missed provider visit | Refused Provider visit & seen later | Hospital Discharge Plan followed |
| Patient Identifier | 11 & 17 | All except #6 | 1,2, 4, 5,6, 8,9, 10  13, 14,15, 18, 20, | 12 | 7 & 16 | 1& 19 | Changed per provider order 7,14,16 & 18 |
| # of Patients | 2 | 18 | 13 | 1 | 2 | 2 | 4 |

The specific findings of this chart review as shown in table 4 are:
- All patients were seen by the nurse upon return from the hospital except one patient who was seen within approximately three hours after his return by a physician assistant.
- Two patients were released to the community from the hospital and one was released on temporary release status upon return to the jail
- The provider saw with the timeframe of the guidelines 13 of the 17 patients who were returned to the jail from the hospital or who remained in the jail for at least 24 hours . This includes one person who saw mental health not the medical provider The circumstances for the four patients not seen within the timeframe of the guidelines was as follows

    o Two patients refused the provider visit, which was initially scheduled within the required time frame. They were subsequently seen.
    o Two patients (patients # 7 & #16) missed a provider visit that was scheduled within the required timeframe .The documentation was not clear as to why they missed the visit. However there was documentation that a provider was managing their care . Patient 7: was returned on 11/14 for treatment of lac lip. He was seen by a nurse upon return & again on  11/15 & 11/17. On 11/14 his medication was changed from clindamycin ultram to vicodin as the PA determined patient needed stronger meds for pain. The patient missed his scheduled provider visit on 11/16. He was again scheduled for the PA on 11/18 but he was released from jail before seeing the provider. Patient 16 was released from hospital on 11/20 (Saturday) and seen by nurse upon return. This patient had been sent to the ER for a probable dental abscess. The ER physicians did not order medications . The PCDCC PA ordered medication for the patient n the 11/20. The patient was scheduled to see the PA on 11/22 but missed this visit and saw PA him on 11/23.

- The discharge orders of the physicians at the hospital were carried for all inmates returned to the PCDCC except in four cases. In each of these four cases the provider authorized a change to the treatment plan and it was documented:
    o Patient 7  Medication changed by PA from clindamycin ultram to vicodin as patient needed stronger meds for pain.

8

- Patient 14   Medication (phrenergan & benadryl) changed by MD at PCDCC. As reported the hospital physicians had ordered two Antihistamines
- Patient 16:  No Meds were given or ordered at the hospital. Vicodin given per PA at PCCDCC.
- Patient 18: ER ordered Ativan. PA changed it to vistaril due to addiction issues.

<u>Four Patient Interviews:</u> I reviewed charts and conducted interviews with four patients to look at concerns raised by plaintiff's counsel. The interviews with all four of these patients were private and positive. All patients reported the care they received was good and none of them had filed health care grievances. They did express some concerns but none of them suggested the facility staff had been negligent in their health care. What follows is a summary of these cases; each preceded with a statement of the particular issues that plaintiff's counsel requested I review.

Patient J

Plaintiff Issues: This *individual seems to have both mental health issues and multiple injuries, including one fracture that required surgery. Also has had MRSA over the summer of 2009 and the medication management of that should be reviewed.*

Patient J  was born 10/09/76  and was booked into the jail on 1/30/10 and subsequently sentenced and transferred to prison in January 2011. He was not incarcerated at this facility in the summer of 2009 or any time in 2009. During his incarceration at PCDCC in 2010-2011 he had multiple adjustment problems, which resulted in frequent housing in segregation. He received both mental health and medical care . The medical care he received was for  chronic knee pain, skin infection, cellulites and one fracture that required surgery.

Below is summary of his major medical concerns addressed at the jail, which was prepared by the facility physician.

*Patient J 's skin infection was not noted booking. The patient did not report any past history of MRSA. His skin infection was first noted by a triage nurse on 2/9/10 and the patient was seen for this condition as well as for his concern of knee pain that was previously reported to triage nurse on 2/6/10. He was found to have an open area of cellulites on his coccix  region. The patient was treated with sulfa/thrimethroprim 800/160 mg 1 tab twice per day from 2/10/10 to 2/16/10 as well as Tylenol 325 mg 2 tabs three times per day for the same days. The culture for the cellulites lesion on his coccix was negative for MRSA. The clinician ordered also  x- ray of his right knee since the patient reported pain for the last 3 -4 mos or so. X- ray was done on 2/11/10 that was reported as normal. There was a 2nd episode of cellulites this time on 11/4/10 located on his right gluteal region that was also treated with septra starting the date of the visit (11/4/10) 1 tab twice per day for 7 days. There was no culture done on this last episode of cellulites, but the patient responded well to the antibiotic management.*

9

Patient O

Plaintiff Concerns: *Multiple mental health and medical issues. History of brachia plexus injury with significant long-term pain management issues.*

Patient O born 10/11/67 was booked into the jail on 6/03/09. During his incarceration at the PCDCC he had multiple adjustment problems and has spent much of this incarceration in segregation housing. At booking it was noted that patient broke his back in 2006, his right arm paralyzed and he was taking gabapentin /methadone and sleep pill. It was documented that this patient has a history of chronic pain syndrome due to past history of motor vehicle accident in 2006 that resulted on dorsal spine fracture and right brachial plexus injury. The patient did not have a known history of mental health treatment, however at the PCDCC he received treatment for depression and anxiety .

The PCDCC medical director reports that this patient has been on the same medication regiment since he arrived to the jail, that is MS contin 15 mg twice per day and gabapentin 400 mg 2 tabs twice per day. He also was prescribed medication for his depression and anxiety starting 3/12/2010. I reviewed his medication administration record for the period 7/1//09- 11/30/10. During this time period there was documentation that he received Gabapentin and Morphine sulf per order (twice a day) on most days and starting on March 12, 2010 and he received mental health medication at bedtime on most days. There were a few days where there was no documentation that he received his medications. They included:14 days for gabapentin, 12 days for morphine and 7 days for amtriotyline. I did not determine if these missed medications were a refection of lack of documentation or actual misses

Patient S

Plaintiff Concerns: *Long-term inmate with dietary concerns (salt) related to cardiovascular problems for which he is on multiple medications.*

Patient S born 06/15/49 was booked into the PCDCC on 04/02/10, left 9/28/10 and incarcerated again on 12/20/10. During this stay at the PCDCC his chronic care issues including hypertension, shortness of breath, edema, and anemia were managed by nursing and providers. Patient S was put on a heart diet. He reported that it was too salty and returned to a regular diet. In 12/31 he was put on a vegan diet and reported to me that it has a "good flavor". However, reportedly, in February he requested to back to a regular diet. During my interview with Patient S , he stated the medical services were adequate and in general all medications are available. He stated he would like the facility to provide supplements such as vitamin D and he would like medical staff to differentiate between name brand and generic brand medications

I reviewed his medication administration record for May, July and Sept of 2011 and requested the PCDCC director of nursing review it for the current incarceration .During these May, July and September 2010 there was documentation that he received all medications except for one day in July and for 2 pills in September.
The PCDCC medical director and the director of nursing reviewed his medication compliance for this current incarceration . The facility physician reported, Patient S *came to the jail on 12/20/10 late in the afternoon. Nursing found out that he did not have a current prescriptions and put him*

10

*on BP checks and that he needed services achieve control of his blood pressure He was started by the on call practitioner on 12/21/10 on clonidine 0.3 mg single dose and then continued with clonidine 0.1 mg BID. He was seen by the PA the following day (12/22/10) furosemide 20 mg QD and lisinopril 40 mg QD were added, labs were drawn that day. Nursing continued to monitor him and on 12/27 a triage nurse noted that the patient reported missing medications at night. Again on 12/31 the patient was assessed by triage nurse that consulted with the on call provider (that day was a County holiday) and the patient was given and additional 0.2 mg of clonidine for BP control. On January 2nd (Sunday) labetolol 100 mg single dose was given to the patient when she consulted with the on call provider. The patient was seen at clinic on January 3rd and an additional dose of clonidine 0.2 mg was given at the clinic visit and metoprolol 50 mg QD was started . On January 6th the patient was seen at the clinic and the dose of metoprolol was increased to 50 mg BID. The patient is now doing much better his last BP on 2/2/11 was 139/87.*
*His current medications are: Furosemide 20 mg QD, Calcium carbonate 500 mg 2 tabs TID, Simethicone 80 mg TID, Metoprolol 50 mg BID, Lisinopril 40 mg QD and*
*Potassium chloride 10 meq QD*

The director of nursing reported on documentation on his medication administration record for December 2010 and January 2011. Her findings, in addition to what was reported above were: In *Dec 22 thru Jan 6. Patient S missed two doses of meds on Jan 6 because he was in court for two med passes, he missed a 1400 antacid on Jan 2 because he moved and he refused his antacid on Jan 2. He received the rest of his meds. From January 6 through January 31st this inmate missed eight doses of his medications: Four times because he was at recreation, twice because he was in court and twice because his Tums had not arrived from the pharmacy. He received every dose of his lasix, klor-con, lisinopril and metoprolol during that time. The only medications he missed were Tums and Simethicone- -given at noon when he was a recreation or court.*

Patient D

Plaintiff Concerns: *This patient is a paraplegic. His criminal defense lawyer has already had contact with Chief Karr and Mr. Adams. The DON is well aware of his needs and concerns. Current issues, per his criminal defense attorney indicate he has a bladder infection that he was sent to the hospital for because the jail was not changing his catheter/ cleanliness issues. He may also have a open wound on his back because of cleanliness issues.*

This individual born 12/12/86 was most recently booked into the PCDCC on November 06, 2010. This patient is a paraplegic. On 11/6 he was seen by the jail physician when he was booked again into the facility. He has received ongoing services at PCDCC for chronic pain management including physical therapy, dressing changes for lesions on lower back an sacral region, management of catheter and treatment of UTI .

When this patient was booked into the PCDCC medical staff reportedly expressed concern that there were going to be issues regarding his housing due to the clinic remodel, so they made arrangements with the department of corrections to secure a bed for the patient, but this plan was not accepted by the patient's attorney.

I reviewed this patient's medication record for 11//1 -12/13 and confirmed he regularly received his prescribed medications: garapentin, nitrofurantoin and also an antibiotic during this period. My interview with him confirmed that he had been experiencing some difficulties in managing his health needs. He raised two concerns. One was the shower in

11

the temporary clinic location was difficult for him to maneuver his wheel chair. The other was he wanted privacy in changing his depends. During my visit, I discussed with the medical director and a block officer the idea of the officer fastening a temporary cover over part of the cell when the patient needed to change his depends. In this way the patient could tell the officer and the officer could put a small temporary privacy cover while the patient changes his depends.

In regard to the management of his Foley catheter, the following is a summary prepared by the facility medical director. *The patient has a history of status post gun shot injury on back with injury to his spinal cord that resulted on paraplegia and neurogenic bladder and incontinence. The patient arrived to the facility with permanent Foley catheter on his bladder. He was found to have recurrent urinary track infections as well as early formation of decubitus ulceration mainly located on lower lumbar region and sacral region. The patient was found to have early skin involvement on 12/12/10 that worsen but as of today this complication has improved. The patient reported to me that he had similar complications in the past.*

*He was sent on a local ER on 12/31/10 since the patient was febrile and 1 day before he was started on antibiotics for urinary track infection, (since this was a long weekend due to the holiday I think this intervention was appropriate). The patient was observed for a few hrs at the local ER and the antibiotic was changed with good improvement of this condition. The patient has been now asymptomatic for UTI but a recent urine culture reported again evidence of bacteria growth.*

*Patients with this neurological condition (paraplegia due to spinal cord injury) as well as the need for bladder catheterization are at a higher risk of these two complications. When patients are in need of a permanent bladder catheter (Foley catheter) the risk for infection and colonization increases due to the nature of having a foreign object in the bladder. The Foley catheter is removed every 3 to max 4 weeks. But now we have this patient on a condom catheter that we are hoping will be a better option for him in decreasing the risk for recurrent bladder infections.*
*The skin involvement (decubitus ulcerations) is the other very common complications on paraplegic patients. It requires intense motivation from the patient to keep changing positions. As of now this patient has developed a good relationship with one of our male nurse that is assisting him on his nursing needs as well as motivating him to keep exercising, changing positions and keeping himself clean. The patient now has access to our clinic shower that we did not have before due to the remodeling project; this may have been the cleanliness issue that the defense attorney was bringing as an issue.*

### ALCOHOL WITHDRAWAL
Under Alcohol withdrawal there were two terms required by the settlement agreement:

A. *Screening form: Judith Cox, Dr. Dr. Balderrama, Dr. Shansky will agree by 10/ 5''10 upon a form that complies with minimum constitutional standards*

B. *Three assessments per day —one per nursing shift —will occur for those on alcohol withdrawal watch who are available in their assigned cluster. However, aid inmates can be removed before 48 hours have expired when based on the clinical judgment of a registered nurse and approved by a clinician*

On November 4th I participated in a conference call with Dr Balderrama and Dr. Shansky during which we agreed on a screening form and procedures. A summary of this agreement is as follows:

> Inmates are referred to nursing staff from the booking officer for risk of alcohol intoxication. The booking nursing staff will screen these inmates. Inmates too intoxicated to ambulate without assistance and those with evidence of acute withdrawal will not be admitted to the jail .For inmates admitted to the jail who have risk indicators the booking nurse will record the inmate's vital signs in the electronic record, place them on monitoring assessment protocol( requiring monitoring once per shift utilizing the screening form agreed to in the above conference call ) and adhere to the following booking nurse guidelines for management of these inmates:
>
> - Known alcoholic with history of treatment for alcohol withdrawal here: house in main jail, low bunk, call MOD for orders, put on TID Nurse Call and 1400 Nurse Call for alcohol withdrawal assessment. Enter a report in the Behavior Tab. (Note:
> - Inmate states he has a history of alcohol withdrawal symptoms or an expectation of alcohol withdrawal: house in main jail, low bunk, put on TID Nurse Call and 1400 Nurse Call for alcohol withdrawal assessment and place on Urgent List. Enter a report in the Behavior Tab.
> - Inmate has a history of regular consumption of >2 alcoholic beverages per day, has DWI charges or is intoxicated at booking and has no history of alcohol withdrawal symptoms---house in main jail, low bunk, put on TID Nurse Call and 1400 Nurse Call for alcohol withdrawal assessment. Enter a report in the Behavior Tab

The PCDCC medical director has confirmed that the withdrawal monitoring protocol was fully implemented as of 12/20/10.

To review the facility's compliance with these procedures I looked at several data sources. including: 1) the PCDCC rejection list for 12/1/10- 1/ 7/11, 2)a list of all patients on withdrawal between 12/24- 1/7 with their start and finish dates and, 3)a sample of charts and a QI study on inmates placed on withdrawal protocol between 12/21/10 and 1/7/11.

My review of the booking rejection list confirmed the practice for rejecting inmates too intoxicated to ambulate without assistance and those with evidence of acute withdrawal from confinement to the PCDCC. Among the sixty-nine rejections documented for this period six were related to substances. The specific reasons for rejection were as follows: 1) acute intoxication, 2) intox, unable to stand, 3) possible OD unknown substance, 4) intoxicated unable to stand, 5)intoxicated, loss of bowels, carried in and 6) too drunk to stand at bar .

The list of patients, which I reviewed, represented all patients on withdrwal monitoring at the PCDCC between 12/24/10 and 1/7/11 . It contained the patient's name, date started and finished on w/d protocol, if the inmate was released from PCDCC confinement while on w/d protocol, and physician initials (to denote approval) on all patients released prior to 48 hours. This data (supported the facility's compliance with the withdrawal(w/d) monitoring

13

protocol . In total there were 64 patients on w/d protocol during this period. Thirty-one of these patients were released from the PCDCC while they were still on the w/d protocol of which most were released within 24 hours. Sixteen were removed form the w/d protocol by the medical director within 24 hours to less than 48 hours of being put on the protocol. This was documented by the physician's initial next to the patients name on the w/d list Seventeen patients were on the protocol for 72 hours and take off by the RN .

I also looked at a data (Table 5) from a sample of 25 patients listed on the above w/d monitoring for 12/24/10-1/7/11. This data was complied as part of a facility QI study and from my review of charts. I reviewed this data to track referral source, rather vital signs were taken in booking and if inmates on the w/d protocol received monitoring assessments on all three shifts.

| Table 5 : Sample of 25 inmates On Withdrawal Monitoring Protocol in 12/10 & 1/11 ||||
| Total # | Referred by Booking Officer to Booking Nurse & put on protocol while inmate was in booking | Vital signs taken in booking | Nursing Assessment nearly 100% completed @3/shift* |
| --- | --- | --- | --- |
| 25 | 22<br>3 referred after booking | 18 yes<br>7 suicidal , Or 3NA | 100% yes |
| *excludes on missed visit or inmate at court ||||

The major findings illustrated in Table 5 are as follows: :
* Most inmates who were put on w/d monitoring were identified in booking. Twenty-one of the twenty-four inmates on withdrawal monitoring were referred to a booking nurse by the booking officer. The remaining 3 were put on a w/d protocol after booking. They were first identified after booking by mental health staff or the unit officer.

* Booking Nurses are taking vital signs in booking of inmates placed on a w/d protocol and recording these signs in the record Vital signs were entered in the record at booking on 17 of the 24 inmates, Of those 7 inmates without vital signs entered in the medical record at booking three inmates identified after booking and four inmates were not cooperative or suicidal during the booking process.

* Inmates on w/d monitoring are being assessed once per shift by nursing . In this review there was only one incident when the monitoring assessment did not occur and that was because the inmate was out to court when the nurse came to provide the monitoring assessment.

PLAINTIFF CONCERNS
There were four additional concerns for my review which were submitted by Plaintiff's Counsel

*Concern 1: Should the critical medication list be reviewed by a psychiatrist?*
The facility medical director, Dr Balderrama reported that in January 2011 he and the Dr. Gleyzer, the facility psychiatrist reviewed the critical medication list and agreed the only psychiatric medication that they considered a critical was clozaril . They further agreed it would be added to the list of medications in the booking nurse guidelines.

14

Additionally, the October 2010 nursing guidelines require a copy of the booking screen to be sent to mental health staff on all inmates with an identified history of psychiatric treatment or psychiatric medication. Finally the director of mental heath at the facility has confirmed that it is practice for inmates with psych meds indicated on their screening form to be assessed within 24 hours by mental heath. In this way the patient's mental health medication is managed.

*Concern 2: Should the medical officer be contacted for inmates who state they have an expectation or history of withdrawal ?*
My opinion is the current nursing guidelines provide for appropriate management of these inmates. Under the current practice the vital signs of all inmates thought to be at risk of withdrawal are taken in booking and they are referred to the MOD if they meet the following criteria
- o *BP<100/56: notify MOD*
- o *BP>160/90, P100, T>99.9, in inmate who is not being treated: notify MOD*
- o *BP>180/110, P>110, T>100 in inmate who is being treated: notify MOD*

Additionally, inmates who state they have an expectation or history of withdrawal are placed under the withdrawal monitoring and on a PA urgent list. If at the first monitoring visit(next shift) the nurse finds any of the vital signs listed above the MOD will be contacted.

*Concern 3: Asthma patients are similarly treated differently depending on whether they have a history at the jail of respiratory distress or asthma treatment , as opposed to inmates who are newly booked and have histories*
My interpretation of the nursing guidelines which was verified by the medical director is as follows: After the nurse consults with the medical provider inmates with documented asthma treatment histories at the PCDCC or a prescription for an inhaler (with provider approval)keep their inhaler &/or one is ordered. Those without such documentation would need a physician order. Under this practice if the inmates does not have a prescription or no prior treatment history and does not show symptoms the inmate would be expected to use the routine (non-emergency) way of accessing clinic services via a health care request. Nursing staff also advises patients to notify unit officer and triage nurse if any asthma related symptoms are present so they can access non-routine clinic services for re-assessment. This seems reasonable to me in responding to how triage is using done at a correctional facility not as an expert in asthma treatment

*Concern 4: Opiate withdrawal also presents a potential issue of differential treatment for those inmates with a history at the jail for opiate withdrawal, although in this circumstance it may well be that the intent of the guideline is seeking to identify a variety of inmates whose reported histories indicates that they are at risk, i.e. even if an inmate denies opiate intoxication , history of use , systems , etc.*
The practice requires identification of inmates at risk of opiate withdrawal, including further assessment of their suicide potential. Inmates assessed as at risk of opiate withdrawal are put on a monitoring protocol . If the inmate at risk of opiate withdrawal also had one of the other heath care conditions identified in the nursing guidelines the guidelines governing this other condition would also be followed.

15